# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TBC, INC. | : | |
| | : | |
| v. | : | Civil No. CCB-14-3644 |
| | : | |
| DEI SALES, INC. | : | |

## MEMORANDUM

Plaintiff TBC, Inc. ("TBC") has sued defendant DEI Sales, Inc. ("DEI") for failure to compensate TBC adequately for its work. Now pending are DEI's motion for summary judgment (ECF No. 104), TBC's motion for leave to file a surreply to DEI's motion for summary judgment (ECF No. 113), DEI's motion for other relief for contempt of ECF No. 97 (ECF No. 103), and TBC's motion for leave to file a surreply to DEI's motion for other relief for contempt of ECF No. 97 (ECF No. 112). The motions have been fully briefed, and no hearing is necessary to their resolution. *See* Local Rule 105.6.[1] For the reasons discussed below, DEI's motion for summary judgment will be denied, DEI's motion for other relief for contempt of ECF No. 97 will be granted, and TBC's motions for leave to file surreplies will be denied.

## BACKGROUND

TBC describes itself as an advertising and public relations agency. (Compl., ECF No. 2, ¶ 16.) DEI, a former client of TBC, is the surviving entity of a merger between DEI and Polk Audio, Inc. ("Polk Audio") in February 2014. (Mot. Summary Judgment Ex. 2, ECF No. 104-4 (Articles of Merger).) At all times relevant to the complaint, Polk Audio and DEI sold consumer audio equipment, including headphones and speakers. (*See* Compl. ¶ 20.) DEI Holdings, Inc.

---

[1] Accordingly, TBC's requests for hearings (ECF Nos. 105-14 and 107-44) are denied.

("DEI Holdings"), a former defendant in this action, was the parent company of both Polk Audio and DEI. (*See id.* ¶ 2.)

In 2011, Polk Audio hired TBC to "carry[ ] out [its] advertising and integrated marketing communications programs for it's [*sic*] sports headphone product line." (Mot. Summary Judgment Ex. 1 ("2011 Contract"), ECF No. 104-3, § 1.) For those services, the parties agreed that Polk Audio would pay TBC a monthly fee of $12,500, based on 83 agency hours per month at a discounted, "blended" rate of $150.[2] (2011 Contract, Addendum II, § I.A.) The 2011 Contract also provides for commissions, reimbursement, and payment of certain other costs by Polk Audio. (2011 Contract, Addendum II.) For work outside the scope of services defined in the contract—i.e., "work related to Polk Audio, Inc.'s headphone product line(s)," (2011 Contract, Addendum I)—the parties agreed that the compensation and reimbursement schedule set out in Addendum II would not apply, (2011 Contract § III & Addendum II § I.D). Rather, such services would be billed in accordance with their "mutual agreement." (*Id.*)

In 2012, DEI contracted with TBC to promote its Active Sound Bar product and to provide social media services. (Mot. Summary Judgment Ex. 3 ("2012 Contract"), ECF No. 104-5, Addendum I.) Like the 2011 Contract, the 2012 Contract states that out-of-scope work is not covered by the agreement's compensation and reimbursement schedule, and it provides that such work will be billed in accordance with the parties' "mutual agreement." (2012 Contract § III & Addenda I, II.) According to TBC, it was fully compensated for work performed pursuant to the 2012 Contract, including out-of-scope work. (*See* Compl. ¶ 27.) Thus, the terms of the 2012 Contract are not at issue in this action.

---

[2] According to the complaint, "[the] blended hourly rate is the average of the various hourly rates of the TBC employees who performed most of the services and work under the [2011 Contract]." (Compl. ¶ 23.)

In 2013, Polk Audio engaged TBC to provide services related to a marketing campaign for the Heritage Collection, a new line of personal audio equipment. (*See* Opp. to Mot. Summary Judgment Ex. 9 ("Burch Dep."), ECF No. 107-14, at 62; *id.* Ex. 6 ("Tripodi Dep."), ECF No. 107-10, at 254.) The parties did not enter into a separate written contract, but they agreed to at least some of the terms expressed in the 2011 Contract, including the payment of a $12,500 monthly fee. (*See* Burch Dep. at 65-66, 300-01; Mot. Summary Judgment Ex. 4 ("Tripodi Aff."), ECF No. 104-6, ¶ 10.) TBC provided services under those terms from January 1, 2013 through March 31, 2014. (*See* Tripodi Aff. ¶ 4.) During that period, TBC received the $12,500 fee each month, in addition to other payments. (*See id.* ¶ 9; Mot. Summary Judgment Ex. 6, ECF No. 104-8 (list of payments to TBC).)

On or around June 19, 2013, TBC's Executive Vice President and Managing Director, Howe Burch, attended a dinner meeting with the chairman and CEO of DEI Holdings and DEI, James E. Minarik, DEI Holding's Chief Marketing Officer, Blair Tripodi, and DEI Holding's Chief Design Officer, Michael DiTullo, at a Baltimore restaurant. (*See* Burch Dep. at 144-45.) One of the topics discussed at dinner was the number of hours worked by TBC since January 1, 2013, which far exceeded the baseline of 83 hours per month ("additional hours"). (*See id.* at 145-48.) Mr. Burch explained that TBC was "getting killed on the hours" and could not continue to work under those circumstances. (*Id.* at 145, 147.) According to Mr. Burch, he was assured that TBC would be "made whole." (*Id.* at 147-48.)

On June 21, 2013, Mr. Burch sent Mr. Tripodi an e-mail ("June 21st e-mail") discussing the additional hours, including an attached "TBC Manpower report" showing that TBC's hours for Polk Audio exceeded the baseline of 83 hours per month by 1,460 hours during the period of

January 1, 2013 to June 14, 2013. (*See* Mot. Summary Judgment Ex. 7, ECF No. 104-9; *see also* Burch Dep. at 150-54.) Mr. Tripodi received and reviewed, but did not respond to, the June 21st e-mail. (*See* Tripodi Aff. ¶¶ 17-19; Burch Dep. at 153-54.)

Allan Charles, TBC's Chairman and Chief Creative Officer, spoke with Mr. Tripodi regarding the additional hours on at least two occasions after the June 21st e-mail. (*See* Opp. to Mot. Summary Judgment Ex. 10 ("Charles Dep"), ECF No. 107-15, at 120-21 (discussing meetings on August 16, 2013, and September 22, 2013); *see also* Burch Dep. at 99, 154-55, 175, 183 (explaining that Mr. Charles met with Mr. Tripodi multiple times to discuss the additional hours and to follow up on the June 21st e-mail).) According to Mr. Charles, Mr. Tripodi promised to pay for the additional hours, stating that he was a "fair guy" and would "make [TBC] whole." (Charles Dep. at 121.)

Mr. Tripodi continued to request, and TBC continued to perform, work until January 28, 2014, when Mr. Tripodi informed Mr. Burch that Polk Audio and DEI were terminating their contracts with TBC. (*See* Burch Dep. at 300; Tripodi Dep. at 122-23; Tripodi Aff. ¶¶ 4, 31.) On January 30, 2014, Mr. Tripodi confirmed the termination by letter. (*See* Mot. Summary Judgment Ex. 14, ECF No. 104-16; Tripodi Aff. ¶ 32.) On February 7, 2014, TBC submitted an invoice ("February 7th invoice") for "3,261.50 actual work hours in 2013 in excess of the original budgeted 996 work hours in 2013." (*See* Mot. Summary Judgment Ex. 15, ECF No. 104-17, at 1.) The invoice listed the amount due for the 2013 calendar year as $489,225.00. (*Id.*) Through a letter from counsel, Polk Audio and DEI rejected the invoice on February 28, 2014. (*See* Mot. Summary Judgment Ex. 16, ECF No. 104-18.)

In September 2014, TBC filed a complaint in Maryland court, naming DEI Holdings,

DEI, Polk Audio, Polk Audio, LLC, Boom Movement, LLC, Definitive Technology, LLC, and Sound United, LLC as defendants. (*See* Compl.) The complaint alleged counts of intentional misrepresentation, concealment, breach of fiduciary duty, negligent misrepresentation, constructive fraud, breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and conversion. (*Id.* ¶¶ 106-267.) The defendants removed the case to this court, asserting diversity jurisdiction. (*See* Notice of Removal, ECF No. 1.) In March 2015, the court dismissed all claims except for TBC's breach of contract and unjust enrichment claims against DEI. (Mem. & Order of March 24, 2015, ECF Nos. 30-31.) These motions followed.

## ANALYSIS

I. DEI's Motion for Summary Judgment

DEI has moved for summary judgment as to TBC's breach of contract and unjust enrichment claims.[3] The court considers each below.

A. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the non-moving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties

---

[3] As noted in the court's previous opinion, the court will construe TBC's claim for "quantum meruit" as one for unjust enrichment. (*See* Mem. of March 24, 2015, at 10 n.5.)

will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48. The court must view the evidence in the light most favorable to the non-moving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

      B. <u>Breach of Contract</u>

To prevail on a breach of contract claim under Maryland law, "a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Int'l Waste Indus. Corp. v. Cape Envtl. Mgmt., Inc.*, 988 F. Supp. 2d 542, 550 (D. Md. 2013) (quoting *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001)). TBC alleges that DEI breached the 2011 Contract. (*See* Compl. ¶¶ 248-249 (alleging breach of the "Polk Contract" and resulting damages); ¶ 22 (defining "Polk Contract" as the contract executed by Polk Audio and TBC on March 1, 2011).) Thus, the court must determine whether Polk Audio had an obligation under the 2011 Contract, either as written or as subsequently modified, to pay TBC for additional hours worked in 2013.[4]

The parties entered into the 2011 Contract on March 1, 2011, and it remained in effect

---

[4] As DEI notes, TBC does not always clearly distinguish between a modification of the 2011 Contract and the formation of a new contract between the parties in 2013. (*See* Opp. to Mot. Summary Judgment at 9 (referring to "2013 Contract/Agreement").) Because the breach of contract claim in TBC's complaint relates solely to the 2011 Contract, (*see* Compl. ¶¶ 248-49), the court will not consider arguments that rely on the existence of a separate operative agreement, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (claim must be supported by facts consistent with the allegations in the complaint).

until March 31, 2014. (*See* Mot. Summary Judgment Ex. 14 (letter dated January 30, 2014, notifying TBC that the 2011 and 2012 Contracts would terminate in 60 days).) Section II of the 2011 Contract provides that TBC "will perform the services described in the Scope of Services Schedule attached . . . as Addendum I." (2011 Contract § II.) Addendum I specifies that "[t]his Scope of Services covers work related to Polk Audio, Inc.'s headphone product line(s)." (2011 Contract, Addendum I.) "Work related to other products and/or services are [*sic*] outside of this Scope of Services and if desired, supplemental Agreements will be provided." (*Id.*)

Addendum II sets out the agency compensation and reimbursement schedule. (2011 Contract, Addendum II.) The parties agreed that TBC would receive, among other compensation, "a monthly fee of $12,500 for the services listed in Addendum I," to be billed and paid on a monthly basis. (2011 Contract, Addendum II § I.A-D.) For work outside of the scope of services, the contract provides that TBC's services "must be approved in advance and in writing by Client, are not included in the fees described in [Addendum II], and will be billed by Agency to Client in accordance with the mutual agreement of the parties." (2011 Contract § III.) Addendum II contains a similar provision. (2011 Contract, Addendum II § I.D ("As specified in Section III of this Agreement, work that is outside the Scope of Services Schedule (Addendum I) is not covered by the Compensation and Commissions noted above and will be estimated, approved and billed separately, in accordance with the parties' mutual agreement.").)

As these provisions show, the 2011 Contract's billing and payment provisions apply only to work within the scope of services. (*See* 2011 Contract § III & Addendum II § I.A-D.) In this action, however, TBC seeks recovery exclusively for out-of-scope work.[5] (Compl. ¶¶ 43-45; *see*

---

[5] Viewing the facts in the light most favorable to TBC, the evidence shows that out-of-scope work—specifically, TBC's work on the Heritage Campaign—constituted all or nearly all of its work for Polk Audio in 2013. (*See* Burch

7

Opp. to Mot. Summary Judgment, ECF No. 107, at 9-10.) Accordingly, any obligation for DEI to pay the February 7th invoice must arise from a modified version of the 2011 Contract, rather than the original written agreement.

DEI contends, as an initial matter, that the parties could not have modified the 2011 Contract because it contains both a non-modification clause and a non-waiver clause.[6] The relevant provisions read:

> This is the entire agreement between the parties relating to the subject matter of this Agreement and all prior understandings and agreements, whether oral or written, are void and of no effect. Neither party is relying on any statement or representation of the other that is not expressly contained herein. No waiver of any provision of this Agreement shall be construed as constituting a waiver of any such provision on a subsequent occasion. This Agreement may be modified only by a written document signed by the parties and may not be assigned by either party without the written consent of the other.

(2011 Contract § IX.E.)

In Maryland, however, the presence of a non-modification or non-waiver clause is not dispositive. Rather, the parties to a contract "may modify their original agreement by their conduct 'notwithstanding a written agreement that any change to a contract must be in writing.'" *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 88 (4th Cir. 2016) (quoting *Univ. Nat'l Bank v. Wolfe*, 369 A.2d 570, 576 (Md. 1977)). This rule applies even where the written contract contains a non-waiver clause. *See id.* (citing *Hovnanian Land Inv. Group, LLC v. Annapolis Towne Ctr. at Parole*, 25 A.3d 967, 978-83 (Md. 2011)). In *Hovnanian*, the Maryland

---

Dep. at 66; Charles Dep. at 101-02.) At trial, of course, TBC bears the burden of proving that any work for which it seeks to recover was out-of-scope and therefore subject to the terms of the parties' agreement for such work.

[6] DEI also argues that TBC's contract modification theory is inconsistent with the pleadings because the complaint does not mention a specific orally modified contract. Under the pleading standard set out in *Twombly*, however, *see* 550 U.S. at 563, the complaint provides sufficient notice of TBC's claim, (*see, e.g.*, Compl. ¶¶ 22-24 (describing terms of 2011 Contract); *id.* ¶¶ 43-45 (describing parties' subsequent agreement with respect to 2013 work); *id.* ¶ 44 (alleging that TBC agreed to perform work in 2013 "outside the Scope of Services as set forth in the [2011] Contract"); *id.* ¶¶ 248-249 (alleging breach of the [2011] Contract).)

Court of Appeals held that "a party may waive, by its actions or statements, a condition precedent in a contract, even when that contract has a non-waiver clause." *Hovnanian*, 25 A.3d at 983. Although the contract at issue in *Hovnanian* did not contain a non-modification clause, the court referred to non-modification and non-waiver clauses interchangeably, and its analysis relied on both kinds of cases. *See id.* at 981 (describing the approach of commentators to "non-waiver or non-modification clauses"); *id.* ("Since *Pelton*, Maryland courts have consistently reaffirmed that a party can modify or waive contractual provisions despite a provision purporting to limit those abilities."). *Hovnanian* thus stands for the principle that Maryland law declines "to give dispositive and preclusive effect to contractual limitations on future changes to that contract . . . whether it is mutual modification, novation, waiver of remedies, or . . . a waiver of condition precedent." *Galloway*, 819 F.3d at 88 (quoting *Hovnanian*, 25 A.3d at 978-83).

The question here, then, is whether the parties modified the 2011 Contract in a manner that obligated DEI to pay the February 7th invoice. "[W]hether subsequent conduct of the parties amounts to a modification or waiver of their contract is generally a question of fact to be decided by the trier of fact." *University National Bank*, 369 A.2d at 576. This case is no exception. The evidence in the record—including the deposition testimony of Mr. Burch, Mr. Charles, and Mr. Tripodi; the June 21st e-mail; and evidence showing that DEI paid TBC $12,500 per month in 2013[7]—reflects genuine disputes of fact regarding DEI's payment obligations for the work completed in 2013. The court considers several of these issues below.

The parties dispute, for example, whether the parties agreed that Polk Audio would pay

---

[7] Because the 2011 Contract does not govern payment for out-of-scope work, the evidence showing that TBC received the $12,500 monthly fee each month in 2013 is, on its own, sufficient to create a dispute of fact as to the modification of the 2011 Contract. (*See* Tripodi Aff. ¶ 9; Mot. Summary Judgment Ex. 6 (list of payments to TBC).)

DEI for additional hours worked. At their depositions, both Mr. Burch and Mr. Charles testified that Mr. Tripodi was aware of the additional hours and repeatedly promised to pay TBC for them. (*See, e.g.*, Burch Dep. at 116 ("Mr. Tripodi had told TBC, myself, and Mr. Charles on multiple occasions that he recognized that we were . . . over hours significantly, and that he would make us whole, and pay us for those overages in 2013. So we believed him."); Charles Dep. at 121 ("He said he would pay us. I promise you—the words he used to me were, I promise you I will make you whole. I'm a fair guy. I will pay you for your hours.").) Mr. Tripodi offers a conflicting account, stating that the $12,500 fee was a flat-fee retainer paid pursuant to the 2011 Contract "regardless of whether TBC actually worked the assumed 83 hours in that month," (Tripodi Aff. ¶ 8), and that TBC at no time indicated that the work requested by Mr. Tripodi in 2013 "would be in excess of the retainer," (*id.* ¶ 20).

The parties also contest the significance of the June 21st e-mail, in which Mr. Burch informed Mr. Tripodi of the exact number of additional hours TBC had worked through mid-June and sought to have "a conversation" regarding those hours. (*See* Mot. Summary Judgment Ex. 7 at 1.) Mr. Tripodi states that he interpreted the e-mail as "an attempt by TBC and Mr. Burch to impress [him]," rather than a request for payment. (Tripodi Aff. ¶ 18.) Mr. Burch, by contrast, describes the e-mail as part of a series of exchanges during which he and Mr. Charles repeatedly informed Mr. Tripodi of the additional hours, and Mr. Tripodi repeatedly promised to pay. (*See* Burch Dep. at 153-55.)

Finally, numerous factual disputes remain as to the terms of any modified agreement.[8] The evidence suggests that, initially, the parties agreed that at least some of the terms outlined in

---

[8] Because the terms of the agreement under which the parties were operating are unclear, the court will not consider the parties' arguments regarding waiver at this time.

the 2011 Contract would apply to TBC's work in 2013. (*See, e.g.*, *id.* at 65 (explaining that the parties agreed to continue their relationship under the terms of the 2011 Contract); Tripodi Aff. ¶ 10 (stating that TBC was paid the monthly fee "pursuant to the 2011 Contract" in 2013).) Because the 2011 Contract reflects different requirements for in-scope and out-of-scope work, however, it is unclear which provisions the parties intended to govern the 2013 work, as well as whether they continued to modify the 2011 Contract throughout 2013. Both Mr. Burch and Mr. Charles testified, for example, that it was the parties' regular practice for Mr. Tripodi to approve work verbally or by e-mail, although the 2011 Contract requires certain approvals to be in writing. (Burch Dep. at 68-73; Charles Dep. at 103.) Because the parties in Maryland "may modify their original agreement by their conduct," even where a non-modification or non-waiver clause is present, *see Galloway*, 819 F.3d at 88 (citing *University National Bank*, 369 A.2d at 576), the court cannot say that, as a matter of law, the written terms of the 2011 Contract control.

Viewing the evidence in the light most favorable to TBC, genuine issues of material fact preclude summary judgment. It is for the fact-finder to decide whether the conduct of the parties shows that they modified the 2011 Contract and, if they did, the terms of such modification. The court therefore will deny DEI's motion for summary judgment as to TBC's breach of contract claim.

### C. Unjust Enrichment

DEI also moves for summary judgment as to TBC's claim of unjust enrichment, arguing that the claim fails as a matter of law. First, DEI contends that the existence of an express contract between the parties precludes TBC's claim. Second, DEI argues that, on the undisputed facts, TBC cannot satisfy the elements of unjust enrichment under Maryland law.

As the court noted in its previous opinion, "a claim of unjust enrichment, which is a quasi-contract claim, 'may not be brought where the subject matter of the claim is covered by an express contract between the parties,'" *Janusz v. Gilliam*, 947 A.2d 560, 567 (Md. 2008) (quoting *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607 (Md. 2000)). Courts have recognized exceptions to this rule, however, "when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter." *Id.* at 567-68 (quoting *J. Roland Dashiell & Sons*, 747 A.2d at 608-09). Here, the 2011 Contract specifically excludes out-of-scope work from its billing and payment provisions, (*see* 2011 Contract § III & Addendum II § I.A-D), and the parties point to no other written contract as governing the subject matter, (*see* Burch Dep. at 65). Thus, DEI is not entitled to summary judgment on the basis that an express contract precludes TBC's unjust enrichment claim.

Alternatively, DEI argues that TBC cannot satisfy the elements of the cause of action. In Maryland, an unjust enrichment claim has three elements: (1) "[a] benefit conferred upon the defendant by the plaintiff"; (2) "[a]n appreciation or knowledge by the defendant of the benefit"; and (3) "the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000) (quoting *Cty. Comm'rs*, 747 A.2d at 607 n.7). Viewing the evidence in the light most favorable to TBC, the court concludes that there are unresolved issues of fact as to all three elements. The parties dispute, for example, the content of conversations between Mr. Burch, Mr. Tripodi, and Mr. Minarik on June 19, 2013; between Mr. Charles and Mr. Tripodi on August 16, 2013; and between Mr. Charles and Mr.

Tripodi on September 22, 2013. It will be necessary for the fact-finder to assess the credibility of witnesses and weigh their testimony to determine whether these conversations show, *inter alia*, knowledge and inequitable retention of a benefit by DEI. *See Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (weighing of evidence and credibility determinations are tasks for the jury, not the court)). In light of these ongoing disputes, summary judgment is not appropriate.

For the reasons discussed above, DEI's motion for summary judgment as to TBC's unjust enrichment claim will be denied.

  II.  DEI's Motion for Other Relief for Contempt of ECF No. 97

DEI has filed a motion for other relief for contempt of ECF No. 97, Judge Copperthite's order that TBC produce the requested timekeeper records in native format with metadata ("native format"). (Order of July 25, 2016, ECF No. 97.) The parties agree that TBC has not produced the records in the format specified in the order. Rather, it produced a .csv file based on a "query" to a database maintained by Landmark, its vendor. TBC contends, *inter alia*, that (1) the .csv file is a "permissible 'near-native' format," (Opp. to Mot. for Contempt, ECF No. 105, at 4); (2) the use of a query is "the most efficient means of pulling up specific timekeeping data from TBC's entire database while protecting the integrity of TBC's database and preventing the production of unrelated and not discoverable data," (*id.* at 7); (3) producing the data in native format would be expensive and time-consuming; and (4) DEI has not sufficiently justified its need for the data in native format. These arguments are not persuasive.

Under Federal Rule of Civil Procedure 26, the parties are entitled to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and

proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Proportionality considerations include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* Where a party seeks the production of electronically stored information ("ESI"), the party from whom discovery is sought may avoid production if it can show that the ESI is "not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). Even upon such a showing, however, the court may order the material to be produced if the requesting party shows good cause. *Id.* Further, the court "may specify conditions for the discovery." *Id.*

Here, the requested records are reasonably accessible and of critical importance to the claims, which center on alleged additional hours worked by TBC. "[O]rdinarily, the presumption is that the producing party should bear the cost of responding to properly initiated discovery requests." *Thompson v. U.S. Dep't of Housing and Urban Dev.*, 219 F.R.D. 93, 97 (D. Md. 2003) (citing *Oppenheimer Fund Inc. v. Sanders*, 437 U.S. 340, 358 (1978); *Murphy Oil USA v. Fluor Daniel*, 2002 WL 246439 (E.D. La. Feb. 19, 2002)). TBC states that the production would take approximately five calendar days and cost about $5,000. These costs are not unduly burdensome in comparison to the amount in controversy.

Moreover, the plain terms of Judge Copperthite's order direct TBC to "produce the time records as requested, specifically the original timekeeper records in native format with metadata to the extent that it exists." (Order of July 25, 2016.) TBC did not file a request for

reconsideration or motion for other relief.[9] Rather, it appears to have substituted its own judgment for the court's as to whether a .csv file based on a query constitutes an appropriate substitute for records in native format.

In light of the above, the court will grant DEI's motion for other relief for contempt of ECF No. 97. Federal Rule of Civil Procedure 37(b) lists the sanctions a court may impose for a party's failure to obey a discovery order, which include: directing that the matters covered by the order be taken as established for purposes of the action; prohibiting the non-compliant party from proceeding on certain theories or introducing certain evidence; dismissing the action in whole or part; and treating the failure to comply as contempt of court. Fed. R. Civ. P. 37(b)(2)(A). Regardless of whether the court imposes sanctions, it must award reasonable attorneys' fees to the prevailing party "unless the failure [to comply] was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

DEI requests that the court dismiss the case or preclude TBC from introducing any evidence related to the time records, which it acknowledges would likely result in dismissal. Dismissal is the most severe sanction available, and it ordinarily should not be imposed without warning. *See Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 40-41 (4th Cir. 1995). Such a severe sanction is not warranted here. Rather, the court will order TBC to produce the requested records, in native format with metadata, unless some other query is agreed to, within 21 business days, and to pay reasonable costs associated with the preparation and filing of DEI's motion for other relief in the amount of $2,050.00.

---

[9] Although TBC did not request relief from compliance with the order, it appears to question its validity, suggesting that the order was hastily entered by the court and is the product of misrepresentations by DEI. These arguments are not convincing. In any case, the court need not consider them, as such claims should have been raised in a direct challenge to the order, rather than as a defense to non-compliance with its terms.

III.  TBC's Motions for Leave to File Surreplies

Finally, TBC has filed two motions for leave to file surreplies: one in regard to DEI's motion for summary judgment (ECF No. 113), and one in regard to DEI's motion for other relief for contempt of ECF No. 97 (ECF No. 112). "Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003) (citing Local Rule 105.2(a)). The court may permit a surreply where the moving party would be unable to contest matters that were presented to the court for the first time in a reply. *Id.* (citing *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001)).

Regarding the motion for summary judgment, TBC contends that DEI raises the following new legal theories and issues: (1) TBC relies upon a 2013 contract; (2) DEI cannot determine what work TBC performed in 2013; (3) TBC has not alleged that James Minarik was acting on behalf of DEI or for any other entity; and (4) DEI is not the proper party. None of these arguments warrants a surreply. The first and third respond directly to points made in TBC's opposition. (*See* Opp. to Mot. Summary Judgment at 9 (referring to "2013 Contract/Agreement"); *id.* at 9-10 (stating that James Minarik acted "on behalf of [DEI]" in engaging TBC for work in 2013).) The second is DEI's commentary on the evidence presented by TBC. And the fourth does not appear to be an accurate description of the issues raised on page six of DEI's reply.

Regarding the motion for other relief for contempt, TBC asserts that DEI raised two "new and incorrect allegations" in its reply. (Mot. for Surreply to Mot. for Contempt, ECF No. 112, at 1.) First, TBC asserts that DEI's reply brief raises the "implication that it did not have an opportunity to design a 'mutually acceptable query' to produce 'a report of data to which both

sides could agree met the spirit of the July 25, 2016 Order." (*Id.* (citing Reply to Mot. for Contempt, ECF No. 109, at 4)).) Setting aside whether an "implication" is an appropriate basis for a surreply, TBC does not accurately summarize DEI's argument at page 4. A longer excerpt reads as follows:

> TBC further argues that it need not produce the native timekeeper data as ordered by this Court because it provided other, newly created documents well after the discovery deadline that excuse its compliance with this Court's Order. . . . TBC is not empowered to create new documents after the discovery deadline and provide them after the discovery deadline to meet its discovery obligations. Moreover, TBC created these documents without any attempt to allow DEI Sales to review the data fields, data tables, and other database attributes to design a mutually acceptable query to produce a report of data to which both sides could agree met the spirit of the July 25, 2016 Order.

(Reply to Mot. for Contempt at 4 (emphasis added).) This language is both responsive to and consistent with TBC's own account, which explains that it attempted to resolve the discovery dispute by preparing a letter with supporting documentation and presenting it to DEI. (*See* Opp. to Mot. for Contempt at 13 ("Plaintiff's Counsel provided Defendant's Counsel with a comprehensive letter dated August 25, 2016 and ten (10) enclosures . . . reflecting the results of TBC's investigation.").)

Second, TBC points to DEI's statement "that Plaintiff is requesting or 'initially' requested damages in the amount of Twelve Million Dollars ($12,000,000.00)." (Motion for Surreply to Mot. for Contempt (citing Reply to Mot. for Contempt at 9).) Although this description accurately reflects the language in DEI's reply brief, it does not present a new issue that TBC would be unable to contest. *See Khoury*, 268 F. Supp. 2d at 605 (citing *Lewis*, 154 F. Supp. 2d at 61). Rather, it is a statement of the record that either accurately or inaccurately describes the amount of damages requested by TBC. The court has the full record at its disposal,

and further briefing in the form of a surreply is not required.

## CONCLUSION

For the reasons stated above, DEI's motion for summary judgment will be denied, DEI's motion for other relief for contempt of ECF No. 97 will be granted, and TBC's motions for leave to file surreplies will be denied. A separate order follows.

September 18, 2017                                        /S/
Date                                                                                                        Catherine C. Blake
                                                                                                          United States District Judge